**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| SUZANNE RICE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CAUSE NO. 1:08-CV-00137 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## OPINION AND ORDER

Plaintiff Suzanne Rice, who is proceeding *pro se*, appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying her application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 1.) For the reasons set forth herein, the Commissioner's decision will be AFFIRMED.

### I. PROCEDURAL HISTORY

Rice applied for DIB on January 20, 2004, alleging that she became disabled in 1994; she later amended her onset date to January 1, 2000. (Tr. 23, 41, 77, 192.) Her date last insured for DIB was December 31, 2004 (Tr. 72.); therefore, she must show that she was disabled as of that date. *See Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

The Commissioner denied her application initially and upon reconsideration, and Rice requested an administrative hearing. (Tr. 52-53, 56-58, 61-66.) On September 12, 2006,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

Administrative Law Judge ("ALJ") John Pope conducted a hearing at which Rice, who was represented by counsel at the time, and a vocational expert testified. (Tr. 628-70.) On May 24, 2007, the ALJ rendered an unfavorable decision to Rice, concluding that she was not disabled because despite the limitations caused by her impairments, she could perform a significant number of jobs in the economic region. (Tr. 20-34.) The Appeals Council denied Rice's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 7-9.)

Accordingly, Rice filed a complaint with this Court on May 22, 2008, seeking relief from the Commissioner's final decision. (Docket # 1.) This appeal became ripe for the Court's review on May 20, 2009. (*See* Docket # 23, 26, 29, 30, 35.)

## II. FACTUAL BACKGROUND[2]

### A. Background and Daily Activities

As of her date last insured, Rice was fifty-three years old; had a high school education, had taken some business college and continuing education classes, and held a certification in creative writing; and possessed work experience as a secretary. (Tr. 32, 198, 290, 633-34.) Rice alleged in her DIB application that she became disabled due to multiple chemical sensitivity, spinal injury, chronic fatigue, fibromyalgia, and depression. (Tr. 192, 635.)

At the hearing, Rice testified that she lives with her husband of thirty years in a one-story home and that she is independent with her self care. (Tr. 632-33, 641.) She stated that her only job in the last fifteen years was as a secretary for her husband's business, which ended in 2000 when they sold the business. (Tr. 290, 634.) She represented that she cannot tolerate working as

---

[2] The administrative record in this case is voluminous (670 pages), and the parties' disputes involve only small portions of it. Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

a secretary any more because of the "fumes" from computers, carpets, and wallpaper, and people-related "fumes" such as perfumes and colognes. (Tr. 648.)

When asked to describe her typical day, Rice reported that she rises about 8:30 a.m. and performs household tasks (including vacuuming and laundry), talks on the telephone, and researches her various health conditions on the internet. (Tr. 639, 641.) She reclines about 3:00 p.m. and rests until approximately 8:00 p.m., but then often stays up until midnight or later. (Tr. 640-41, 651.) Her hobbies include writing and recording music, walking, and riding her bike. (Tr. 642.) She said that although she gets along well with people, she has no social life other than calling her mother daily and taking her on outings twice a month. (Tr. 643-44.)

Rice explained that her day varies significantly when she is suffering from a chemical exposure in that she significantly limits her activity and does not exercise. (Tr. 642.) She explained that on an ongoing basis, she has "pain everywhere generally" that feels "dull [and] achy", but that when she is in the "midst of a significant or extreme [chemical] exposure", her various conditions cause her "searing, burning, stabbing pain and reactions in [her] brain and nervous system, spinal cord, breathing problems, stabbing pain in other areas, liver, spleen, female organs, [and] numbness pretty [much] head to toe on the inside." (Tr. 636, 645.) Sometimes these symptoms cause her to be bedridden while other times they make her feel hyperactive. (Tr. 636.) She also stated that she has difficulty concentrating. (Tr. 644.) She reported that her symptoms from a chemical exposure can last "months, sometimes weeks, sometimes years, depending on . . . how bad the damage was." (Tr. 646.)

Rice testified that she receives treatment for her sensitivity to chemicals, including taking vitamins and detox supplements, but that they are not covered by insurance and are very

expensive. (Tr. 636-37.) Her doctors have also recommended that she spend time outdoors and walk as much as possible. (Tr. 638.) In addition, Rice explained that she has designed and implemented certain ventilation systems for her home, such as in her laundry area, to minimize her symptoms. (Tr. 654-55.)

As to her mental health, Rice clarified that she could not tolerate any of the anti-depressants that she was prescribed because she had severe reactions to them. (Tr. 643.) And, she stated that she could not afford to go to mental health professionals and instead relies upon the physicians that treat her chemical sensitivity. (Tr. 643.)

With respect to her physical endurance, Rice reported that she could walk between two and four hours in an eight-hour workday, stand for approximately two hours; and has no significant problems with sitting provided that she occasionally alternates between sitting and standing. (Tr. 647.) She stated that she has no trouble operating the steering wheel or pedals when driving a car, but that she cannot stoop or bend and gets winded climbing stairs. (Tr. 647, 651.)

## B. *Summary of the Medical Evidence*

From 1993 to 2001, Rice was treated by various healthcare providers for her multiple chemical sensitivity and other complaints, including the Center for Help and Health, Dr. James Hutton, Dr. Alfred Johnson, and various "environmental specialists". (Tr. 340-446.)

On January 27, 1995, Rice underwent an MRI, the results of which showed degenerative disk disease at C5-C6 and C6-C7. (Tr. 305.) From 1993 to 1997, Rice received physical therapy on an as-needed basis, and her complaints of cervical and shoulder pain, radicular headaches, and head pain significantly reduced. (Tr. 319-36.)

4

From December 2003 to July 2004, Rice saw Dr. Jack Hinkle thirteen times for her multiple chemical sensitivities and related complaints. (Tr. 510-21.) He diagnosed her with multiple chemical sensitivity, chronic fatigue syndrome, and fibromyalgia. (Tr. 518.)

On March 5, 2004, Rice was evaluated by Dr. Michael Holton at the request of the Social Security Administration. (Tr. 447-49.) She reported to Dr. Holton that she was injured as a result of exposure to various noxious chemicals in 1993 when contractors worked on her home; she complained of chronic neck and back pain, occasional shooting pains down her left arm, fatigue, and cognitive difficulties. (Tr. 447.) The results of her respiratory, cardiovascular, musculoskeletal, and neurological examinations, however, were all normal, except that she had some scattered areas of moderate joint stiffness. (Tr. 448-49.)

On March 31, 2004, Rice was evaluated by mental health counselor Curt Korten; the evaluation was countersigned by Neal Davidson, Ph.D. (Tr. 453-61.) She reported a history of chemical sensitivity to construction materials since 1993, explaining that exposure to them causes a "burning" in her brain, chest, and esophagus; spotty skin; leg problems; hearing difficulties in her left ear; vision problems in her right eye; swollen lymph nodes; fibromyalgia; and depression. (Tr. 453.) She also complained of sensitivity to the electromagnetic frequencies of computers, explaining that though she uses a home computer daily, she keeps it locked in a cabinet to minimize its effects. (Tr. 454.) Rice explained to Mr. Korten that finding treatment for her disabilities is her hobby in that she spends time every day researching her various conditions on the internet. (Tr. 456.)

Upon mental health exam, Rice was clear, coherent, and in touch with reality, though her responses were somewhat grandiose and verbose. (Tr. 457-58.) Mr. Korten observed that she

5

presented as agitated, rather than depressed. (Tr. 459.) He assigned her a diagnosis of mood disorder not otherwise specified, rule out somatization disorder, rule out delusional disorder, and personality disorder not otherwise specified, and assigned her a Global Assessment of Functioning (GAF) score of 55.[3] (Tr. 460.)

On April 19, 2004, Dr. J. Sands, a state agency physician, reviewed Rice's medical record and opined that she could lift and carry ten pounds frequently and twenty pounds occasionally; stand or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; perform unlimited pushing and pulling; occasionally climb, balance, stoop, kneel, crouch, and crawl; and must avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation. (Tr. 463-70.)

On May 30, 2004, D. Unversaw, Ph.D., a state agency psychologist, reviewed Rice's medical record and opined that she had a moderate limitation in her activities of daily living and social functioning, and a mild limitation in maintaining concentration, persistence, or pace. (Tr. 473-90.) He opined that despite her mental health limitations, she could perform work consisting of simple, repetitive tasks. (Tr. 489-90.) A second state agency psychologist later affirmed his opinion. (Tr. 489.)

On July 22, 2004, Dr. Hinkle wrote a twelve-page letter addressed to "To Whom It May Concern", summarizing his treatment of Rice and opining that she was "certainly disabled at this time from any gainful employment." (Tr. 520.) More specifically, he opined that Rice was

---

[3] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. American Psychiatric Association, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000). A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

6

unable to pursue her previous activities in music writing and recording because of her "major limitation in energy and ability to focus and to think" and that she was unable to afford an optimal treatment program, which would include, among numerous other things, a clean-up of her home environment and the installation of a filtering system.[4] (Tr. 520.)

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt*, 395 F.3d at 744 (citation omitted). The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or

---

[4] Also enclosed in the record (and attached to Rice's reply brief) is an evaluation completed by Dr. Grace Ziem on June 28, 2007. (Tr. 603-05.) This evidence was submitted to the Appeals Council *after* the ALJ issued his May 24, 2007, opinion, and the Appeals Council determined that it did not provide a basis to change the ALJ's decision. (Tr. 7-8.)

In that regard, "[i]f new and material evidence is submitted, the Appeals Council shall consider the additional evidence only where it relates to the period on or before the date of the administrative law judge hearing decision." 20 C.F.R. § 404.970(b); *see Getch v. Astrue*, 539 F.3d 473, 484 (7th Cir. 2008); *Schmidt v. Astrue*, 395 F.3d 737, 742 (7th Cir. 2005) (declining to consider medical records describing the claimant's condition as of a date after the ALJ's decision was rendered); *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990) (declining the claimant's invitation to consider medical records that postdated the ALJ's decision because "the reports postdating the hearing speak only to [the claimant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration"). Here, Dr. Ziem's evaluation speaks only to Rice's condition as of June 28, 2007, and does not attempt to opine about her condition as of her date last insured. Therefore, the Appeals Council did not err in declining to review the ALJ's decision on the basis of this additional evidence.

substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Clifford*, 227 F.3d at 869.

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform her past work; and (5) whether the claimant is incapable of performing work in the national economy.[5] *See* 20 C.F.R. § 404.1520; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). An affirmative answer

---

[5] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite her limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a). The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

8

leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.* The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## B. The ALJ's Decision

On May 24, 2007, the ALJ rendered his opinion. (Tr. 23-34.) He found at step one of the five-step analysis that Rice had not engaged in substantial gainful activity from her onset date of January 1, 2000, through her date last insured, December 31, 2004, and at step two that she had the following severe impairments: chronic fatigue, fibromyalgia, degenerative disk disease, and personality disorder. (Tr. 26.) At step three, he determined that Rice's impairments were not severe enough to meet a listing. (Tr. 26.) Before proceeding to step four, the ALJ determined that Rice's testimony concerning the intensity, persistence, and limiting effects of her symptoms was "not entirely credible," and assigned the following RFC as of her date last insured:

> [T]he claimant had the residual functional capacity to lift and carry 20 pounds occasionally and ten pounds frequently. The claimant could stand/walk at least two hours in an eight hour workday, and she could sit about six hours in an eight hour workday. The claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but she could never climb ladders, ropes, or scaffolds. The claimant would have needed to avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, and other pulmonary irritants. The claimant would have been limited to simple, repetitive tasks.

(Tr. 27.) Based on this RFC, the ALJ concluded at step four that Rice could not perform her past relevant work as a secretary. (Tr. 32.) The ALJ then proceeded to step five where he determined that, considering her age, education, and experience, Rice could have performed a significant number of other jobs within the economic region as of her date last insured, including working

as a sales attendant, mail sorter, and office helper. (Tr. 33.) Therefore, Rice's claim for DIB was denied. (Tr. 33-34.)

### C. Analysis of the ALJ's Decision

Rice fails to advance any challenges to the ALJ's decision with particularity. Instead, she simply reiterates in her briefs her various medical issues and symptoms, expounds her theories as to their causes, discusses the treatments she has tried, and generally vents her frustration with government-assistance programs. Because she has not developed any arguments with specificity concerning the basis for the ALJ's decision, Rice has waived all challenges to the ALJ's opinion. *See, e.g.*, *Webster v. Astrue*, 580 F. Supp. 2d 785, 794 (W.D. Wis. 2008) (explaining in a social security appeal that undeveloped arguments are deemed waived (citing *Kochert v. Adagen Med. Int'l, Inc.*, 491 F.3d 674, 679 (7th Cir. 2007)).

And, to the extent Rice is simply requesting that the Court reweigh the evidence in the hope that it will come out in her favor this time, her plea is unavailing, as the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute our own judgment for that of the Commissioner." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nevertheless, to complete the record, the Court will examine the ALJ's opinion in more detail – in particular, the RFC assigned by the ALJ. *See generally id*. ("[The Court's] task is limited to determining whether the ALJ's factual findings are supported by substantial evidence.").

Although an ALJ may ultimately decide to adopt the opinions expressed in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. § 404.1527(e); SSR 96-5p. The RFC

assessment "is based upon consideration of *all* relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence." SSR 96-5p (emphasis added); *see* 20 C.F.R. § 404.1545. Thus, a medical source opinion concerning a claimant's work ability is *not* determinative of the RFC assigned by the ALJ. *See* SSR 96-5p ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment.") (emphasis added).

Here, the ALJ concluded that Rice had the exertional RFC to perform light work, which requires the ability to lift twenty pounds occasionally and ten pounds frequently, and stand or walk six hours out of an eight-hour workday, *see* SSR 83-10, with the following additional limitations: occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds; no concentrated exposure to pulmonary irritants; and work that consists of simple, repetitive tasks. This RFC assigned by the ALJ is consistent with the opinion of the state agency physicians, who concluded that Rice could perform light work, and the state agency psychologists, who found that Rice could perform work consisting of simple, repetitive tasks despite her mild limitations in concentration, persistence, or pace, and her moderate limitations in daily living activities and social functioning. This RFC is also in line with the physical examination results of Dr. Holton, who found normal respiratory, cardiovascular, musculoskeletal, and neurological functioning with the exception of some scattered areas of moderate joint stiffness, and the opinion of mental health counselor Korten and

11

Dr. Davidson, who assigned her a GAF of 55, reflecting moderate mental health symptoms.

In fact, the only medical opinion the RFC was inconsistent with was that of Dr. Hinkle, Rice's treating physician, who opined in July 2004 that Rice was "certainly disabled at this time from any gainful employment." (Tr. 520.) Yet, the ALJ confronted this conflict and discounted Dr. Hinkle's opinion, observing that it lacked the support of "medical findings" (*see* Tr. 31, 513-14), and reasonably inferring that it was based primarily upon Rice's subjective complaints. *See Smith v. Apfel*, 231 F.3d 433, 440 (7th Cir. 2000) (concluding that a treating physician's opinion was entitled to little weight where it was based upon the claimant's subjective complaints rather than objective medical evidence); *Young*, 362 F.3d at 1001 (emphasizing that it is the ALJ's duty, not the Court's, to weigh conflicting medical evidence and decide which doctor to believe); *see generally Stevenson v. Chater*, 105 F.3d 1151, 1155 (7th Cir. 1997) (acknowledging that an ALJ is entitled to make reasonable inferences from the evidence before him).

And, the ALJ properly considered other evidence of record as well when determining Rice's RFC, such as her daily living activities and the treatment she has attempted. *See* 20 C.F.R. § 404.1545 (instructing the ALJ to consider *all* of the relevant evidence in the case record when assessing a claimant's RFC); *Earnest v. Astrue*, No. 1:06-cv-714-JDT-TAB, 2007 WL 2904067, at *11 (S.D. Ind. Sept. 29, 2007) (stating that an ALJ should consider the "effects of treatment" when determining a claimant's RFC); *Gardner v. Barnhart*, No. 02 C 4578, 2004 WL 1470244, at *13 (N.D. Ill. June 29, 2004) (considering a claimant's limitations in activities of daily living when assigning her RFC). That is, the ALJ observed that Rice regularly performs household chores, such as cooking and laundry; visits with her mother at least twice a month; goes on outings to appointments and for shopping; and is independent with her self care. (Tr. 30.) He

also noted that Rice regularly performs extensive online research about her impairments and has spent a significant amount of time sealing and enclosing various systems in her home. (Tr. 28, 30.) And, the ALJ also considered that Rice for the most part had received only conservative treatment for her various conditions. (Tr. 28, 30.)

Of course, when assessing Rice's RFC, the ALJ also determined the credibility of Rice's testimony of debilitating limitations, concluding that she was "not entirely credible." (Tr. 28); *see Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) (explaining that making a credibility determination is inherent in an ALJ's RFC assessment). Because the ALJ is in the best position to evaluate the credibility of a witness, his determination is entitled to special deference. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). If an ALJ's determination is grounded in the record and articulates his analysis of the evidence "at least at a minimum level," *Ray v. Bowen*, 843 F.2d 998, 1002 (7th Cir. 1988), creating "an accurate and logical bridge between the evidence and the result," *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006), his determination will be upheld unless it is "patently wrong." *Powers*, 207 F.3d at 435.

In reaching his credibility determination, the ALJ noted the lack of objective medical evidence supporting the severity of Rice's subjective complaints. *See* 20 C.F.R. § 404.1529(c)(3); *Hall v. Barnhart*, No. 1:04-cv-1847-DFH-TAB, 2006 WL 3206096, at *4 (S.D. Ind. June 15, 2006) (explaining that the absence of objective medical evidence is one factor to be considered by the ALJ when making his credibility determination). For example, he correctly observed that Rice's MRIs and x-rays of her spine showed only minimal to moderate degenerative changes, tests for hepatitis and Lyme disease were negative, blood gases were good, stress test results were negative, chest x-ray was normal, and spirometry testing revealed

13

only mild obstruction. (Tr. 29-831.)

And, as discussed *supra*, the ALJ also considered Rice's daily living activities and the conservative treatment measures she received when determining her credibility. (Tr. 28, 30); *see* 20 C.F.R. § 404.1529; SSR 96-7p (explaining that a claimant's daily living activities and treatment measures are two factors that the ALJ should consider when determining a claimant's credibility). In addition, the ALJ commented on several inconsistencies of record in particular: (1) Rice's assertion that a chiropractor broke her neck in 1994, which is belied by the medical record; and (2) her claim of significant deficiencies in concentration, which is in direct contrast to the length and specificity of her numerous letters and voluminous research she sent to the Social Security Administration with her DIB application. (Tr. 28-29, 32.)

In short, the ALJ adequately articulated his reasoning for his determination that Rice's testimony of debilitating limitations was "not entirely credible", and his determination is not "patently wrong." *Powers*, 207 F.3d at 435. And, after determining Rice's credibility, the ALJ arrived at an RFC that is amply supported by the evidence of record. *See* 20 C.F.R. § 404.1527(e)(1) (articulating that the final responsibility for deciding the claimant's RFC and whether she is disabled is "reserved to the Commissioner"). Then, considering Rice's age, education, and experience, and in reliance upon the testimony of a vocational expert, the ALJ properly applied this RFC and determined that Rice was not disabled because she could perform a significant number of jobs within the economic region, including work as a sales attendant, mail sorter, and office helper.

Therefore, because the ALJ's decision is amply supported by substantial evidence and does not contain legal error, it will be affirmed.

## V. CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Rice.

SO ORDERED.

Enter for this 4th day of June, 2009.

S/Roger B. Cosbey  
Roger B. Cosbey,  
United States Magistrate Judge